UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JABBAR WITHROW,

                              Plaintiff,

      vs.                                 9:05-CV-1129
                                            (DNH/GJD)

J. TAYLOR, et al.,

                              Defendants.
_____

JABBAR WITHROW
Plaintiff pro se

STEVEN H. SCHWARTZ, Asst. Attorney General
Attorney for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

       This matter has been referred to me for Report and Recommendation by the
Honorable David N. Hurd, United States District Judge pursuant to 28 U.S.C. § 636(b)
and Local Rules N.D.N.Y. 72.3(c).

       In this amended civil rights complaint, plaintiff alleges that defendants violated
various of his constitutional rights while he was incarcerated in Gouverneur
Correctional Facility. (Dkt. No. 12).  Plaintiff also claims that certain of the
defendants retaliated against him for the exercise of his constitutional rights.

       Presently before the court is defendants' motion for summary judgment
pursuant to FED. R. CIV. P. 56. (Dkt. No. 32).  Plaintiff has responded to the motion.
(Dkt. No. 33).  Defendants have filed a reply. (Dkt. No. 37).  For the following
reasons, this court agrees with defendants and will recommend dismissal of the

complaint.

## DISCUSSION

### 1. <u>Summary Judgment</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

### 2. <u>Defendant Rahim</u>

The Federal Rules require that a defendant be served within 120 days of filing the complaint. FED. R. CIV. P. 4(m). The failure to serve a defendant within 120 days of filing the complaint may be a ground for dismissal of the complaint unless good cause is shown for an extension of that time. *Id.* It is true that a pro se, in forma pauperis plaintiff may rely upon the Marshal to properly serve the summons and complaint. *Romandette v. Weetabix*, 807 F.2d 309, 311 (2d Cir. 1986).

Defendant Rahim was never served in this action. The Marshal attempted to serve defendant Rahim on March 15, 2006. (Dkt. No. 26). On April 20, 2006, the

Marshal filed a return of service. *Id.*  Attached to the Process Receipt and Return is a letter from the Inmate Records Coordinator from Gouverneur Correctional Facility, dated April 18, 2006, stating that defendant Rahim had not been served because he had been out on sick leave. *Id.* at p.2.  No further attempt was made by plaintiff to have this defendant served.  On May 24, 2007, defense counsel filed a letter stating that defendant Rahim is deceased.[1]

In plaintiff's response to defendants' motion for summary judgment,[2] he had requested an extension of time to serve defendant Rahim. (Dkt. No. 33 at p.8). Plaintiff claimed that he did not know whether defendant Rahim had been served because plaintiff did "not receive the yellow service copy." *Id.*  The defendants' answer to the amended complaint was filed on May 10, 2006, and defense counsel did not respond on behalf of defendant Rahim. (Dkt. No. 29)  Generally, the court would grant an extension of time for plaintiff to serve a defendant, given that plaintiff is pro se and must rely upon the Marshal to serve his complaint.  However, now that defendant Rahim is deceased, and assuming that the cause of action was not extinguished by his death, plaintiff would not only have to substitute defendant Rahim's estate, but would also have to serve the estate.

Rule 25 of the Federal Rules of Civil Procedure provides that if a party dies,

---

[1] The court notes that because defendant Rahim had not been served with process, defense counsel did not include any arguments on his behalf in the motion for summary judgment.

[2] Plaintiff's response to the defendants' motion for summary judgment was filed before defense counsel's letter suggesting the death of defendant Rahim.

and the claim is not extinguished by the party's death, the court may order substitution of the proper party. FED. R. CIV. P. 25(a)(1). A motion for substitution may be made by ***any party***, and the motion must be served on the parties as provided in Rule 5 and served upon non-parties as one would serve a summons pursuant to Rule 4. *Id.* Rule 25 further provides that unless a motion for substitution is made within 90 days after the death is "suggested upon the record by service of a statement of the fact of the death as provided [in the rule] for the service of the motion," the action will be dismissed as against the deceased party. *Id.*

The rule makes it clear that any party may make a motion for substitution, but as soon as a "suggestion of death" is filed, the motion for substitution must be made within 90 days. *Id.* The running of the 90 days commences with the "proper suggestion of death." *George v. United States*, 208 F.R.D. 29, 31 (D. Conn. 2001) (citing *Pastorello v. City of New York*, 95 Civ. 470, 2000 U.S. Dist. LEXIS 15137 (S.D.N.Y. Oct. 18, 2000)). In *George v. United States*, the court cited two affirmative steps required to trigger the 90-day time limitation. *Id.* First, death must be "formally" suggested "upon the record." *Id.* (citing *Barlow v. Ground*, 39 F.3d 231, 233 (9th Cir. 1994)).

Second, the "suggesting party" must serve other parties and non-party successors or representatives of the deceased with a suggestion of death in the same manner as required for service of the motion to substitute. *Id.* Although existing parties may be served pursuant to FED. R. CIV. P. 5, non-parties must be served as if they were being served with a summons pursuant to FED. R. CIV. P. 4. *Id.*

4

In this case, defense counsel filed a letter on May 24, 2007, indicating that defendant Rahim had died. (Dkt. No. 38).  Plaintiff has not responded or requested any action from the court regarding defense counsel's letter, even though defense counsel served plaintiff with this letter.  It is unclear if defense counsel complied with the requirements for a proper suggestion of death, since there is no indication that counsel served the decedent's representative, however, it is also clear that plaintiff has not even responded to the letter.  Although technically, the plaintiff's time to move for substitution would not begin to run until a proper suggestion of death is filed, because this court finds that plaintiff's claims are meritless and is recommending dismissal as to all other defendants, this court will not allow this case to continue as against defendant Rahim's estate even if plaintiff could serve the estate[3] at this time.[4]

3.    **Facts**

Plaintiff begins his amended complaint by stating that on August 27, 2003, he had an argument with defendant Bango regarding plaintiff's attempt to shave his head with his personal electric razor. Amended Complaint (AC) at ¶ 7.  Plaintiff alleges that the argument involved a discussion of the rules and regulations relating to shaving. *Id.* Plaintiff claims that at the end of this discussion, defendant Bango told plaintiff that Bango would be "sending [plaintiff] to the box next." *Id.*  Plaintiff claims that he then

---

[3] Since this action is an individual capacity action under section 1983, the proper party to substitute would have been the successor of the deceased or the representative of his estate. *See*

[4] It is unclear when defendant Rahim died.  On April 20, 2006, when the Marshal filed his return of service, the attached letter indicated that defendant Rahim was ill and was away from work on sick-leave. (Dkt. No. 26).  Defense counsel's letter is dated May 24, 2007. (Dkt. No. 38).  Thus, defendant Rahim must have died between April 20, 2006 and May 24, 2007.

asked defendant Bango whether he was "threatening" plaintiff, and defendant Bango responded that he would "get" plaintiff and that plaintiff could "take it however [he wanted]." *Id.*

Plaintiff claims that on August 29, 2003, he was interviewed by Sergeant Bourgal[5] about a "grievance" that plaintiff allegedly filed against defendant Bango for threatening plaintiff during the hair cutting/shaving incident. AC ¶ 8.  Plaintiff claims that Sergeant Bourgal attempted to intimidate plaintiff by implying that it was plaintiff who was threatening defendant Bango by citing rules and regulations to him.  Plaintiff states that Sergeant Bourgal then made "grueling" remarks about plaintiff's institutional record. *Id.*

Plaintiff states that on September 2, 2003 he did not receive a "commissary sheet," but was told by an officer that he should wait until the next day.  AC ¶ 9.  On September 3, 2003, plaintiff asked defendant Bango about the commissary sheet, but that defendant Bango "refused to help" plaintiff. *Id.*  Plaintiff claims that he later mentioned the commissary sheet to defendant Rahim, the Islamic chaplain, when plaintiff was speaking to him about an unrelated matter. *Id.*  Plaintiff claims that defendant Rahim told plaintiff that the situation would be resolved the next day. AC ¶ 10.

However, plaintiff states that when he returned to his housing unit on September 3, 2003, he was summoned to the infirmary, where defendant Liberty told plaintiff that he was going to the "box." *Id.*  Plaintiff states that defendant Liberty told

---

[5] This individual is not named as a defendant in this case.

defendant Bango to write a false misbehavior report involving plaintiff's inquiry about the commissary sheet, after which plaintiff was confined to the Special Housing Unit (SHU). Plaintiff claims that defendant Liberty told plaintiff that he would be disciplined every time that he complained.

In a very confusing paragraph of the amended complaint, plaintiff alleges that in December of *2003*, defendant Rahim attended one of the Friday Muslim prayer services and told the inmates that he had come to appoint an inmate leader for the Muslim population. AC ¶ 11. Plaintiff states that defendant Rahim later berated plaintiff and took plaintiff off of the Islamic Study Class call-out. *Id.* Plaintiff then claims that on October 14, *2004*, defendant Rahim wrote a false misbehavior report, accusing plaintiff of conspiring with another Muslim inmate to disrupt the upcoming Ramadan holiday, causing plaintiff to be placed in SHU. *Id.*

Plaintiff was the subject of an administrative segregation hearing, during which plaintiff alleges that the hearing officer, defendant Geddis, denied plaintiff requested witnesses in order to ensure that plaintiff would be kept in SHU. AC ¶ 12. Plaintiff also claims that he was held in disciplinary segregation, rather than in administrative segregation, and although he filed "numerous grievances to defendant Taylor," he did nothing. *Id.*

Finally, plaintiff alleges that after Ramadan was over in November of 2004, plaintiff was deprived of his "eid-ul-fitr" meal. AC ¶ 13. The "eid-ul-fitr" meal is a Muslim feast, celebrating the end of Ramadan. *Id.* Plaintiff states that his administrative segregation hearing was reversed on December 22, 2004, and he was

released from administrative segregation after he had already been transferred to Bare

Hill Correctional Facility.

Plaintiff names five defendants.  The first is Justin Taylor, the Superintendent of

Gouverneur Correctional Facility.  Plaintiff claims that defendant Taylor acted with

"deliberate indifference" by allowing his subordinates to violate plaintiff's due

process rights, to violate his First Amendment right to practice his religion, and to

retaliate against plaintiff for exercising his constitutional rights by filing false charges

against him. AC ¶ 14.  The second defendant is Education Supervisor Geddis, who

was the hearing officer at plaintiff's administrative segregation hearing.  Plaintiff

claims that defendant Geddis denied plaintiff due process by denying one of plaintiff's

witness requests and confining plaintiff to SHU "indefinitely". AC ¶ 15.

The third defendant is Corrections Officer Liberty.  Plaintiff alleges that

defendant Liberty told defendant Bango to write a false misbehavior report against

plaintiff in retaliation for plaintiff filing grievances. AC ¶ 16.  The fourth defendant is

Corrections Officer Bango.  Defendant Bango is accused of writing the false

misbehavior report against plaintiff in retaliation for plaintiff's grievances.  Finally,

plaintiff names Yahya Rahim, the Islamic Chaplain.  Plaintiff claims that defendant

Rahim forced his own choice of inmate leadership for the Muslim population, denied

plaintiff a religious meal, and fabricated a misbehavior report against plaintiff in order

to have him confined to SHU, all in violation of plaintiff's First Amendment right to

practice his religion.

**3.    Exhaustion of Administrative Remedies**

Defendants argue that plaintiff has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a).  The PLRA exhaustion requirement applies to ***all inmate suits about prison life***, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004). The Supreme Court has recently held, agreeing with the Second Circuit, that the exhaustion requirement is an ***affirmative defense***, not a jurisdictional prerequisite. *Jones v. Bock*, 127 S. Ct. 910, 921 (2007); *Giano v. Goord*, 380 F.3d at 675-76.  The Second Circuit has also held that there are instances in which the exhaustion requirement may either be waived or excused. *Id.* at 675. (citations omitted).

Additionally, as with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies. *McCoy v. Goord*, 255 F. Supp. 2d 233, 247-48 (S.D.N.Y. 2003).  Where questions of fact exist as to exhaustion, summary dismissal is not appropriate. *Pendergrass v. Corrections Officers*, 01-CV-243A, 2004 U.S. Dist. LEXIS 28224, *6-7 (W.D.N.Y. Sept. 1, 2004). At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004)(remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d

663 (2d Cir. 2004)(whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004)(complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Pursuant to these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006)(citing *Hemphill*, 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The court notes that the Supreme Court's decision in *Woodford v. Ngo*, 126 S. Ct. 2378 (2006) may have changed the law regarding possible exceptions to the exhaustion requirement. In *Woodford*, the Supreme Court held that the PLRA's exhaustion requirement mandates "proper" exhaustion of administrative remedies. In *Woodford*, the plaintiff filed a grievance that was rejected as "untimely." *Id.* at 2384. Woodford appealed the procedural denial through the administrative process, and "technically" exhausted his administrative remedies because there were no administrative remedies "available" to him. *Id.* However, the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983

action in federal court. *Id.* at 2387. "Proper" exhaustion means that the inmate must complete the administrative review process ***in accordance with the applicable procedural rules***, including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 2385-93 (emphasis added).

It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. In fact, based upon the concurring opinion in *Woodford*, it appears that these decisions have ***not*** been overruled in that respect. In that concurring opinion, Justice Breyer specifically noted that two circuits, the ***Second*** Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford*] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford*, 126 S. Ct. at 2393 (citing *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004))(Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a ***traditional exception that the statute implicitly incorporates***." *Id.* (emphasis added).

The Second Circuit has not specifically considered the effect that *Woodford* may have had on *Giano-Hemphill* line of cases.[6] However, in *Ruggiero v. County of*

---

[6] The court does note that the Second Circuit has decided that to the extent that its decision in *Braham v. Casey*, 425 F.3d 177, 183 (2d Cir. 2005) supported a plaintiff's argument that would have allowed for less than "proper exhaustion," it was overruled by *Woodford*. *See Loera Macias v. Zenk*, 2007 U.S. App. LEXIS 17795, *16-17 (2d Cir. July 26, 2007). The issue upon which *Braham* was overruled involved whether "informal complaints" would be sufficient to exhaust a claim. In *Loera Macias*, the Second Circuit implied that the "exceptions" to exhaustion, including availability, estoppel, and special circumstances continued to exist. *Id.* at

11

*Orange*, 467 F.3d 170, 175-76 (2d Cir. 2006), the Second Circuit stated that it did not

need to determine what effect *Woodford* has upon the Second Circuit case law in the

exhaustion area because in *Ruggiero*, the court found that plaintiff would not have

prevailed even assuming the continued validity of the ability to "excuse" non-

exhaustion. *See also Reynoso v. Swezey*, No. 06-1835-pr, 2007 U.S. App. LEXIS

15105, *4 (2d Cir. June 25, 2007)(unpublished order)(continuing to state that the

court was not deciding whether the decision in *Woodford* affected Second Circuit case

law).  In *Sloane v. Mazzuca*, the district court stated that it would follow the "current"

law in the Second Circuit until the Second Circuit specifically addressed the issue.

*Sloane v. Mazzuca*, 04-CV-8266, 2006 U.S. Dist. LEXIS 79817, *19-20 (S.D.N.Y.

Oct. 31, 2006)(citation omitted).

    The Supreme Court cited *Woodford* in *Jones v. Bock*, explaining that the

holding in *Woodford* only imposed a requirement that in order to properly exhaust

administrative remedies, the inmate must "'complete the administrative review process

in accordance with the applicable procedural rules.'" *Jones*, 127 S. Ct. at 922 (citing

*Woodford*, 126 S. Ct. at 2384).  These rules are defined by the prison grievance

process itself, and not by the PLRA. *Id.*  In *Jones*, the Court ultimately held that

exhaustion was not *per se* inadequate simply because a defendant that was later named

in the civil rights complaint was not named in the grievance. *Id.* at 923.

    New York State provides inmates with a grievance procedure to follow by

which inmates may file complaints and appeal adverse decisions. N.Y. CORRECT. LAW

---

*19-22.

§ 139; N.Y. Comp. Codes R. & Regs. tit. 7, §§ 701.1 *et seq.* (NYCRR).  The regular

Inmate Grievance Program (IGP) consists of a three-tiered process. *Hemphill*, 380

F.3d at 682.  The inmate must first file a grievance with the Inmate Grievance

Resolution Committee (IGRC). *Id.* §§ 701.5(a)(1) and (b).[7]  An adverse decision of the

IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c).  Adverse

decisions at the Superintendent's level may be appealed to the Central Office Review

Committee (CORC). *Id.* § 701.5(d).  Time deadlines apply at all levels of the process,

but exceptions to any of the deadlines may be made based on "mitigating

circumstances." *Id.* §§ 701.5(a)(1); 701.6(g).  An inmate must appeal any denial of his

grievance to the highest available administrative level. *Martinez v. Williams*, 349 F.

Supp. 2d 677, 682 (S.D.N.Y. 2004).

There is an expedited process for the review of complaints of inmate harassment

or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8.

Under this procedure, the inmate may (but is not required to) report the misconduct to

the employee's supervisor. *Id.* § 701.8(a).  The inmate then files a grievance under the

normal procedures outlined above, but all grievances alleging employee misconduct

are given a grievance number, and sent immediately to the Superintendent for review.

*Id.* § 701.8(b).

Under the regulations, the Superintendent or his designee shall determine

immediately whether the allegations, if true, would state a "bona fide" case of

---

[7] The court notes that the sections governing inmate grievances were re-numbered in 2006.  This court will refer to the current numbering which is different than the numbers that appear in *Hemphill*.

harassment, and if so, shall initiate an investigation of the complaint, either "in-house", by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3).  An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* § 701.8(h).  A similar "special" procedure is provided for claims of discrimination against an inmate. *Id.* § 701.9.

In this case, defendants argue that plaintiff has failed to exhaust his administrative remedies as against defendants Bango and Taylor.  This court agrees. Plaintiff's only claim against defendant Bango is that this defendant wrote a false misbehavior report against plaintiff on September 3, 2003 in retaliation for "plaintiff writing a grievance and complaint . . . against him." AC ¶ 17.  Plaintiff's only claim against defendant Taylor is that he failed to stop the staff from retaliating against plaintiff.

Defendants have submitted the declaration of Thomas Eagen, Director of the Inmate Grievance Program for the Department of Correctional Services (DOCS). (Attached to Dkt. No. 32).  Director Eagen states that during the time plaintiff was incarcerated at Gouverneur Correctional Facility, he appealed only four grievances to the CORC. Eagen Decl. ¶ 3.  A list of those four grievances is included as Exhibit 1 to Director Eagen's declaration.  None of those grievances relate to defendant Bango or defendant Taylor.  The first grievance is GOV-11041-04 and was filed on November 8, 2004. Eagen Decl., Ex. 1.  The grievance was asking for an "Area of Preference Transfer."  The second grievance is GOV-11042-04 and was also filed on November

8, 2004. *Id.* This grievance accused the Imam of lying and fabricating a misbehavior report.[8]

Plaintiff's third grievance was GOV-11094-04 and was filed on December 6, 2004 and complained that he did not get his feast tray. *Id.* Finally, the last grievance plaintiff filed before his transfer to Bare Hill Correctional Facility was filed on December 15, 2004 and complained about the conditions in Administrative Segregation. *Id.* According to the declaration of Kathleen Besaw, the IGP Supervisor at Gouverneur Correctional Facility, plaintiff only filed three grievances in 2003 while incarcerated at Gouverneur, and it appears that these three grievances were not appealed all the way to the CORC because they were not included in Director Eagen's list. (Dkt. No. 37, Besaw Decl. ¶ 2, Ex. 1).

Two of the three 2003 grievances were filed on August 25, 2003, one of which complained that plaintiff did not get enough time to eat, and the other was asking the location of plaintiff's property. *Id.* The third grievance was filed on August 28, 2003 and although it is a little unclear because of the abbreviations, it appears that plaintiff complained about being charged for a "4th bag" of property. *Id.* None of these grievances mentioned any alleged misconduct by defendant Bango or defendant Taylor. Although as stated above, there is a special grievance procedure for bring claims of employee harassment, plaintiff never brought a grievance against defendant Bango for any alleged harassment.

---

[8] This grievance was the one that exhausted plaintiff's remedies regarding defendant Rahim's alleged actions in having plaintiff placed in administrative segregation.

The record does show that plaintiff wrote one *letter* about defendant Bango. One letter was written directly to Superintendent Taylor and was dated August 27, 2003. Besaw Decl. Ex. 2 at pp.2-3. This letter complained about the shaving incident and accused defendant Bango of threatening plaintiff and acting unprofessionally in the situation. *Id.* Plaintiff sent a copy of the August 27, 2003 letter to the Office of the Inspector General. *Id.* at p.2. Plaintiff wrote a second *letter* directly to defendant Taylor. Besaw Decl. Ex. 2 at pp.7-8. This letter complained about Sergeant Bourgal's investigation of plaintiff's August 27, 2003 letter. Sergeant Bourgal interviewed plaintiff regarding his complaint against defendant Bango, however, plaintiff apparently did not like Sergeant Bourgal's attitude regarding the issue.

Plaintiff appears to think that these *letters* constituted grievances. Based on the outline of the grievance program above, clearly, plaintiff's letters did not amount to grievances. In any event, both of the letters *preceded* the incident of September 2-3, 2003 when defendant Bango allegedly retaliated against plaintiff for filing grievances. Thus, plaintiff has never filed a "proper" grievance against defendant Bango for anything, nor has plaintiff appealed a proper grievance to the CORC complaining of defendant Bango.

Plaintiff has failed to exhaust his administrative remedies with respect to any retaliation claim as against defendant Bango. Plaintiff was well aware of how to file a grievance since he filed three of them at precisely the same time as he wrote the letters to defendant Taylor, two grievances on August 25, 2003 and one on August 28, 2003. Plaintiff could easily have filed a grievance against defendant Bango after defendant

16

Bango allegedly filed the false misbehavior report against plaintiff on September 3, 2003.  Plaintiff has also failed to exhaust any claims as against defendant Taylor. Although not included in defendants' arguments plaintiff has not filed any grievances or exhausted his administrative remedies as against defendant Liberty.

This court cannot find any exceptions in this case to the exhaustion requirement.  Plaintiff was well aware of the grievance process, even though he called his letters "grievances."  Plaintiff stated in his second letter to defendant Taylor that plaintiff would "continue to file grievances whenever your staff commit infringements . . . and I have no fear of reprisal.  A grievance is a Federally protected First Amendment right and I will exercise that right whenever needed." Besaw Decl. Ex. 2 at p.8.

Plaintiff claims that he attempted to file a grievance claiming retaliation against defendants Liberty and Bango, but that the grievance office never responded, and plaintiff was "sabotaged." (Dkt. No. 33, Plaintiff's Response Affirmation at p.3).  On November 20, 2003, Peter Berezny, the IGP Coordinator in Albany wrote an e-mail to Kathleen Besaw, stating that plaintiff had written directly to Albany, complaining that he filed a September 8, 2003 grievance against defendants Liberty and Bango regarding the allegedly "false ticket" in retaliation for filing earlier grievances. Besaw Decl. Ex. 3.  The e-mail also stated that plaintiff complained that he filed a second grievance regarding the amount of time that it was taking to answer the first grievance. *Id.*

The e-mail states that DOCS records showed that there were no grievances filed

by plaintiff in September or October, and Ms. Besaw was instructed to investigate the situation and determine if plaintiff had instead filed a "letter of complaint instead," and if so, whether the letter was "answered." *Id.*  Ms. Besaw contacted the Superintendent's secretary and was told about the letter complaining about an "officer" and the letter complaining about a Sergeant. Besaw Decl. ¶ 8.  Ms. Besaw also states that on December 1, 2003, she was sent a copy of correspondence that was dated November 25, 2003 by Thomas Eagen to plaintiff, to which three documents were attached. Besaw Decl. ¶ 9.

Plaintiff had sent these three documents directly to Director Eagen. Besaw Decl. Ex. 4.  The letter from Director Eagen to plaintiff acknowledged his receipt of plaintiff's documents, but told plaintiff that he could not send grievances directly to the Central Office. *Id.*  Director Eagen's letter also states that the facility records indicated that there were no grievances filed dated either September 8, 2003 or September 21, 2003, alleging retaliation and delay in grievance processing. *Id.* Plaintiff was then instructed to address his concerns to the IGP Supervisor through "regular facility procedure or to Inmate Grievance staff during their rounds." *Id.*

The first document attached to Director Eagen's letter is a hand-written complaint, dated September 8, 2003 about the alleged retaliation by defendants Bango and Liberty in connection with the commissary incident and the second document is a complaint to the grievance department, dated September 21, 2003 and complaining that he did not get a response to the September 8, 2003 grievance.  Although Director Eagen instructed plaintiff to address these concerns through the facility grievance

program, Ms. Besaw states that ***plaintiff never sent the documents to her office***.

Prison officials did ***not*** prevent plaintiff from filing grievances.  In fact, the letters to defendant Taylor were investigated and answered.  When plaintiff states that he was interviewed by Sergeant Bourgal about the shaving incident, he was being interviewed pursuant to Captain M. Caldwell's instructions in response to plaintiff's August 27, 2003 letter to defendant Taylor. Besaw Decl. Ex. 2.  As stated above, plaintiff later complained directly to defendant Taylor about Sergeant Bourgal's attitude during the interview.  This letter was also investigated even though it was not a formal grievance. Besaw Decl. Ex. 2 at pp.7-10.

Plaintiff has simply failed to follow proper procedures for obtaining a response to his complaints.  In plaintiff's response to defendant's motion, he states that he tried to file grievances, and then sent them directly to Thomas Eagen.  Plaintiff states that Director Eagen "responded in a letter, dated 10/7/03 about grievance procedures, ***but didn't respond to the grievance***." (Dkt. No. 33, Plaintiff's Affirmation at p.3) (emphasis added).  Director Eagen was telling plaintiff that he could ***not*** submit grievances directly to Albany, and that he should address these problems at the facility level.  It was plaintiff that failed to do so.  He cannot blame his failure to exhaust on prison officials.  After *Woodford*, notice of the complaints alone is insufficient to satisfy the exhaustion requirement. *See Loera Macias v. Zenk*, 2007 U.S. App. LEXIS 17795, *17-18 (2d Cir. July 26, 2007). Thus, there are no "special circumstances" justifying plaintiff's failure to exhaust his administrative remedies.

The plaintiff has now been released from custody.  The fact of his release,

19

however, does not change this court's analysis.  The Second Circuit has held that the exhaustion requirement applies to those individuals who were confined prisoners at the time they filed their lawsuit.  *See Berry v. Kerik*, 366 F.3d 85, 86 (2d Cir. 2004). His subsequent release does not affect this requirement, even if plaintiff clearly would no longer be able to return and exhaust his claims at this time. *Id.*

Because plaintiff has failed to exhaust his administrative remedies as to defendants Bango, Liberty, and Taylor, and there are no exceptions to the exhaustion requirement applicable in this case, the amended complaint may be dismissed as against these three defendants.  Since plaintiff cannot now return to exhaust these remedies, the dismissal must be with prejudice. *See Berry*, 366 F.3d at 87-88.

## 4.   Due Process

In order to begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).  In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding.  *See Frasier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996)("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHU claim by the standard of *Sandin*); *Samuels v. Mockry*, 77 F.3d 34, 38 (2d Cir. 1996)(assessment as to whether inmate had a protected liberty interest may require fact finding).  The Court in *Sandin* determined that the inmate's discipline in segregated confinement for *30 days* did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id*.

The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000).  In *Colon*, the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id*.  The court concluded that 305 days in SHU would meet the standard. *Id*. at 231.  Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id*. at 234.  The court also noted that the longest confinement in SHU that did *not* meet the atypical requirement was *101 days*. *Id*.  at 231 (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90(2d Cir. 1999)).

In this case, plaintiff alleges that defendant Geddis denied plaintiff due process at plaintiff's administrative segregation hearing on October 19, 2004.  Plaintiff claims

21

that defendant Geddis denied plaintiff the right to call a witness[9] and supports his claim with the fact that the hearing determination was reversed by Donald Selsky on December 21, 2004.  Defendants have filed Donald Selsky's decision. Defendants' Ex. G at 1-2 (Dkt. No. 32).

Defendants first argue that plaintiff had no liberty interest in remaining free from administrative segregation for a period of 69 days.  The Second Circuit has held that with respect to "normal" SHU confinement, a fewer than 101 day confinement does not meet the standard of atypicality. *Ortiz v. McBride*, 380 F.3d 649, 654-55 (2d Cir. 2004).  However, it is also true that shorter periods of confinement could constitute an atypical and significant hardship if the conditions were more severe that the normal SHU conditions. *Id.*  A confinement of as little as 77 days under "unusually harsh" conditions has been sufficient to raise a question of fact regarding the existence of a liberty interest. *Id.* at 655 (citing *Palmer v. Richards*, 364 F.3d 60, 66 (2d Cir. 2004). *See also Wheeler v. Butler*, 209 Fed. Appx. 14, 16 (2d Cir. 2006)(atypicality turns on the conditions of the confinement).

In this case, the only complaint that plaintiff made about the conditions in SHU was that he had not been "granted any of the amenities that [were] supposed to be afforded to those on 'Ad Seg' status." Defendants' Ex. H at 35.  Plaintiff filed a grievance regarding this issue on December 15, 2004, after he had been in

---

[9] Although plaintiff states in his response to the motion for summary judgment that defendant Geddis denied "all of plaintiff's witnesses," there was only one witness that was denied, and that denial formed the basis of Selsky's reversal of the hearing decision. *See* Transcript of Ad Seg Hearing at 20 (Defendants' Ex. D of Dkt. No. 37); Defendants' Ex. G (Dkt. No. 32).

administrative segregation for approximately 60 days. *Id.* The response to plaintiff's grievance stated that the only additional amenities would be the ability to have additional in-cell property and a commissary buy if funds were available in plaintiff's account. *Id.* at 36. The response also stated that these additional amenities needed to be requested by the inmate, but that plaintiff never requested them. *Id.* Plaintiff was transferred to Bare Hill on December 17, 2004. Defendants' Ex. C.

There is no indication that plaintiff's confinement in administrative segregation was any more onerous that the "normal" restrictions imposed in disciplinary or administrative segregation. Plaintiff has not argued otherwise, and as stated above, plaintiff only complained that he had not received "extra amenities." Thus, plaintiff's 69 day confinement in administrative segregation did not implicate a liberty interest, and plaintiff's due process claim may be dismissed.

Even assuming that plaintiff had a liberty interest in remaining free from the 69 day confinement, plaintiff received all the process that he was due, notwithstanding the subsequent administrative reversal. In *Hewitt v. Helms*, 459 U.S. 460, 469-76 (1983), the Supreme Court held that when a liberty interest is created, an inmate must be afforded procedural protections prior to being transferred into the more restrictive confinement.[10] Under *Hewitt*, an inmate placed in administrative segregation must

_____

[10] Although the standard for determining whether a liberty interest is created is now governed by *Sandin*, rather than by *Hewitt*, the standard for determining the process that is due after a liberty interest has been created remains the same. *See Wilkinson v. Austin*, 545 U.S. 209, 229 (2005)(stating that although *Sandin* abrogated the methodology for establishing the liberty interest, articulated in *Hewitt* and in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979), those cases "remain instructive for their discussion of the appropriate level of procedural safeguards"); *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir.

receive some notice of the charges and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate to administrative segregation. 459 U.S. at 476.

Prison officials must conduct an "informal nonadversary evidentiary review" of the information supporting the inmate's administrative segregation, and this review must take place within "a reasonable time following an inmates' transfer." *Id.* at 486 & n.8. *Hewitt* also requires that there be periodic reviews after an inmate's placement in administrative segregation, such that the placement is not "a pretext" for indefinite confinement. *Id.* at 477. A "pretextual" administrative confinement may be raised as a separate constitutional violation. *See Soto v. Walker*, 44 F.3d 169, 173 n.4 (2d Cir. 1995)(citing *Hewitt*, 459 U.S. at 477 n.9).

The DOCS regulations provide that the substantive predicate for an inmate's transfer to administrative segregation is that the inmate's presence in the general population would pose a threat to the safety and security of the facility. NEW YORK CODE RULES & REGS. tit. 7, § 301.4(b)(NYCRR). The regulations also require that administrative segregation inmates receive the same type of hearing as those inmates who are transferred to SHU for disciplinary reasons. 7 NYCRR 301.4(a). The hearing must take place within 14 days of the inmate's admission to SHU, after issuance of the administrative segregation recommendation "made by the employee who ascertained the facts or circumstances." *Id.*

---

2001)(stating that *Hewitt* was "qualified on other grounds by *Sandin*, but using the standard for determining due process articulated in *Hewitt*).

There are several state law requirements for the hearing. The inmate must receive written notice of the reason for his confinement; he must be afforded an employee assistant if he is confined to SHU pending the hearing; the hearing officer must be impartial; the inmate must be allowed to attend the hearing; and he must be permitted to submit documents and call witnesses ***unless the hearing officer finds that they are redundant or irrelevant.*** 7 NYCRR §§ 254.1, 251-4.1, 254.5, 254.6(a)(3). The hearing must be electronically recorded and must be completed within 14 days. *Id.* §§ 251-5.1(b), 254.6(b). Finally, the hearing officer must render a written decision, setting forth the basis for his determination; the inmate must receive a copy of the determination and must be told of his right to appeal. *Id.* §§ 254.7(a)(5), 254.8.

Defendants have filed the transcript of plaintiff's administrative segregation hearing. Defendants' Ex. D of Dkt. No. 37 (AST). Administrative segregation was recommended because prison officials became aware that plaintiff and another inmate were conspiring to disrupt the Ramadan holiday and create "disarray" within the Muslim population. AST at 2. The recommendation was written by Sergeant Skeldon, although the report indicates that he was informed of the situation by staff, and defendant Geddis also considered confidential information. AST at 11. Plaintiff asked for Sergeant Skeldon as a witness because plaintiff wished to question him regarding whether Sergeant Skeldon found any validity to the accusation. AST at 20.

Defendant Geddis denied the witness, finding that the question of where and when a staff member heard about the conspiracy was not a "valid question." *Id.*

Plaintiff argued that defendant Geddis had misinterpreted the question that plaintiff wished to ask, however, defendant Geddis still denied the witness and accepted the administrative segregation recommendation based upon Sergeant Skeldon's report and the "confidential tape." AST at 21-23.  Defendant Geddis also stated that he considered plaintiff's "history of violent acts, fighting, and creating a disturbance." AST at 23.

Defendants have also filed a transcript of the confidential tape under seal. Defendants' Ex. C (Dkt. No. 37).  This court's review of the confidential transcript shows that the administrative segregation decision was well supported.  Although Mr. Selsky reversed plaintiff's determination based upon defendant Geddis's denial of Sergeant Skeldon as a witness, the court cannot find that this denial was a violation of due process.  Plaintiff wished to know where and when he was alleged to have conspired with Inmate Smalls, however, based on the confidential nature of the testimony, defendant Geddis stated that he could not ask Sergeant Skeldon that question. AST at 21.

As stated above, the process due for administrative segregation is "some notice" of the charges and an "opportunity" to present his views.  New York law provides more procedure, however, the fact that New York law provides inmate with a full disciplinary-style hearing does not raise the constitutional requirements for administrative placement.  Plaintiff in this case had a full hearing, and although he was denied one witness, the court finds that there was sufficient evidence before the hearing officer to accept the recommendation.  Thus, this court *first* finds that plaintiff

26

had no liberty interest in remaining free from the 69 day incarceration in administrative segregation, and **second**, that he received all the process to which he was due.

## 5.   <u>Retaliation</u>

The court would not have to reach the issue of retaliation because plaintiff has failed to exhaust his administrative remedies as to defendants Liberty and Bango. Additionally, defendant Rahim, the other defendant against whom plaintiff appears to claim retaliation was never served and subsequently died.  However, the court will comment briefly upon plaintiff's retaliation claims, since defendants have submitted a substantial amount of documentation on the merits of plaintiff's claims.  This section demonstrates that there would be alternative bases for dismissal of plaintiff's claims if the district court were to reject any of the procedural bases for dismissal.

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)(citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489,

491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).  Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett*, 343 F.3d at 137.

In this case, plaintiff seems to allege that this "retaliation" all started when he and Officer Bango had an argument over the cutting of plaintiff's hair on August 27, 2003.  Plaintiff alleges that he filed a "grievance" against defendant Bango and that plaintiff's September 3, 2003 misbehavior report was filed in retaliation for the complaint against defendant Bango.  The court now knows that plaintiff sent a "letter," not a grievance directly to defendant Taylor regarding defendant Bango's actions and that Sergeant Bourgal did interview plaintiff regarding this complaint on August 29, 2003. Defendants' Reply Affirmation, Ex. 2 at 10 (Dkt. No. 37).  Sergeant Bourgal interviewed defendant Bango on September 2, 2003 regarding the hair cutting/shaving incident.  Defendant Bango's statement also appears in defendants' Exhibit 2 at 5. The court notes that a review of the documents shows that plaintiff ***was*** violating the facility rules.  Although he stated that he was shaving his own head, another inmate admitted that ***he*** was giving plaintiff a haircut. *Id.* at 4-5. Thus, defendant Bango actually could have charged plaintiff with misbehavior with respect to the hair cutting incident, but he did not.[11]

---

[11] Plaintiff admitted later during the disciplinary hearing that "they found out that I was getting a hair cut," and Sergeant DeMarco "clarified" the situation for plaintiff. (DT at 27). Plaintiff testified that Sergeant DeMarco explained to him that plaintiff could cut his own hair, but he could not have someone else doing it. *Id.* This is further support for the finding that Officer Bango was correct about the hair cutting incident.

While it is true that plaintiff's August 27, 2003 letter of complaint can be considered protected activity, and it is clear that on September 2, 2003 defendant Bango was aware that plaintiff had made the complaint since defendant Bourgal interviewed Officer Bango on September 2, 2003, a review of the September 3, 2003 misbehavior report and subsequent disciplinary hearing shows that plaintiff would have been disciplined regardless of any protected activity.

As stated above, the September 2-3 incident involved plaintiff's statement that he did not receive a commissary sheet. Plaintiff stated at the disciplinary hearing that he spoke to Sergeant DeMarco about the commissary sheet on September 2, 2003, but Sergeant DeMarco told plaintiff to speak with Officer Bango about the situation. Defendants' Reply Affirmation, Ex. A, (Disciplinary Hearing Transcript)(DT) at 2. Plaintiff stated that he did not initially speak with Officer Bango because plaintiff wanted to stay away from Officer Bango due to the hair cutting incident. *Id.* at 2, 4. However, because Officer Bango was the officer on plaintiff's housing block, plaintiff was required to speak with him. (DT at 3).

Plaintiff stated that Officer Bango told plaintiff that he would have to check about the commissary sheet. (DT at 4). Plaintiff approached Officer Bango later, and asked again about the commissary sheet, but Officer Bango had not yet clarified the situation. *Id.* When plaintiff asked what he should do, Officer Bango stated that if plaintiff went to the commissary without permission, he would be "out of place." *Id.* When plaintiff continued to press Officer Bango for an answer, plaintiff testified that Officer Bango stated "I know that you think that I'm not doing anything for you." *Id.*

29

Plaintiff stated that he then walked away. *Id.* Later, Imam Rahim called plaintiff into his office on an unrelated matter, and plaintiff asked Imam Rahim to help his with his commissary issue. (DT at 5, 17). Imam Rahim testified at plaintiff's disciplinary hearing that he called defendant Liberty to see what could be done. (DT at 17). Plaintiff told Imam Rahim that he had spoken to a "C/O" but that the officer had "not done anything" on plaintiff's behalf. (DT at 17-18).

The hearing officer then discussed the "problem" that plaintiff had with Officer Bango. (DT at 22-23). The hearing officer pointed out to plaintiff that if he thought that Officer Bango was not helping him, then plaintiff should have either filed a grievance or should have spoken to the officer's supervisor. (DT at 24). Later during the evening of September 3, 2003, plaintiff was called to the Sergant's office and given a misbehavior report for interfering with an employee and lying. (DT at 24-25).

Officer Bango testified that he did call the commissary for plaintiff. (DT at 34). It was ultimately determined that there was a problem with the money in plaintiff's account. (DT at 34). The hearing officer found plaintiff guilty, but sentenced him only to "time served" in keeplock. (DT at 36). The hearing officer found that plaintiff was told to wait to straighten out the commissary issue, but he got other employees involved and never mentioned to them that someone was already looking into the matter for him. (DT at 36). The hearing officer stated that inmates must not interfere with or mislead staff and that "it is very common for an inmate to go . . . to three or four different people until he gets the right answer." *Id.*

The hearing officer then explained to plaintiff that "you circumvented the

officer because you felt that you didn't . . . get a good report." *Id.*  Plaintiff then lied to the Imam by telling him that Officer Bango was not doing anything for him. *Id.*  Thus, it is clear from the disciplinary transcript that defendant Bango's misbehavior report was not "false" by plaintiff's own admissions.  Since the misbehavior report could have been issued, regardless of any "bad" feelings between defendant Bango and plaintiff, no claim for retaliation could be maintained against either defendant Bango or Liberty.

## 6.   <u>First Amendment</u>

It is unclear exactly what plaintiff alleges against defendant Rahim.  As stated above, defendant Rahim was never served in this action, there is a statement in the record that this defendant is deceased, and there has been no substitution of an estate.  However, a review of the record also shows that plaintiff's claims are meritless. The amended complaint can be interpreted as making two claims against this defendant.  Plaintiff alleges that he had an argument with defendant Rahim in December of *2003*, and that Rahim wrote a fabricated misbehavior report in October of *2004*.[12] AC ¶ 11.  Plaintiff alleges that the subject of the December 2003 argument was defendant Rahim's appointment of an inmate to be the "representative" of the Muslim community rather than allowing the inmates to vote for a representative themselves.  *Id.*  Plaintiff also claims that he was taken off the Islamic study class call-out, and that while he was in administrative segregation, he was not given his eid-ul-fitr meal at the end of Ramadan.

---

[12] Plaintiff is referring to the administrative segregation placement discussed above.

Plaintiff cannot show that his argument with defendant Rahim in December of 2003 had anything to do with the "misbehavior report" written almost one year later. The law is clear that there is *no constitutional violation* caused by the issuance of a false misbehavior report alone. *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988).  In any event, as stated above, there is no indication that the administrative segregation recommendation was false.  The fact that the determination was later administratively reversed because of the denial of a witness does not "exonerate" plaintiff.

Plaintiff also alleges that he did not get his feast tray.  He attributes this to a retaliatory action by defendant Rahim.  However, when plaintiff filed a grievance regarding this issue, he was told that his name was on the list as a participant in the feast and that "[a]n oversight occurred on the part of the Mess Hall staff.  The oversight had nothing to do with the Imam." Defendants' Ex. H at 24 (Dkt. No. 32). The Imam *did request that plaintiff receive a feast meal*, but the civilian cook "inadvertently failed to send any trays to any inmate in SHU relative to the Muslim Festival." *Id.*  Plaintiff also filed a grievance regarding his Islamic classes and was told that defendant Rahim took plaintiff out of the classes because they were being led by an inmate against whom plaintiff felt some hostility.  Defendant Rahim's responses to all of plaintiff's complaints were stated in a memorandum dated November 17, 2004. *Id.* at 20.

It is well-settled that inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582,

32

588 (2d Cir. 2003)(citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990).  The analysis of a free exercise claim is governed by the framework set forth in *O'lone v. Estate of Shabazz*, 482 U.S.342 (1987) and *Turner v. Safely*, 482 U.S. 78, 84 (1987).  This framework is one of reasonableness and is less restrictive than ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89).  An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006)(citations omitted).

If plaintiff was hostile toward the facilitator of the Islamic classes, removing him from those classes certainly furthered the legitimate penological interest of maintaining order and security in the facility.  Thus, defendant Rahim did not violate plaintiff's First Amendment rights by taking him out of the classes.  Since it is clear that defendant Rahim did put plaintiff on the list for the feast meal, and plaintiff did not get his meal through the oversight of one of the cooks, defendant Rahim could not have been liable for this claim.

**WHEREFORE**, based on the findings above, it is

33

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt. No. 32) be **GRANTED**, and the amended complaint dismissed as against defendants **BANGO, LIBERTY, TAYLOR**, and **GEDDIS**, and it is further

**RECOMMENDED**, that this amended complaint be **DISMISSED** as against defendant **RAHIM** for failure to timely serve and for failure to timely substitute his estate pursuant to **Fed. R. Civ. P. 4(m) & 25**, and that the complaint be **DISMISSED IN ITS ENTIRETY**.

Dated: September 28, 2007

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge